**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

MIDDLESEX INSURANCE COMPANY,

               Plaintiff,

 v.                                      3:08 - CV - 490 (CSH)

DAVID MARA, ALTON PARKS,
individually and as guardian for JAKOB
PARKS and EMMANTHA PARKS, minors,
CELESE PARKS, and ELOUISE WROBEL,

               Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT
## AND DECLARATORY JUDGMENT

HAIGHT, Senior District Judge:

I.      INTRODUCTION AND FACTUAL SUMMARY

      Plaintiff, Middlesex Insurance Company ("plaintiff" or "Middlesex"), commenced this action

for a declaratory judgment that it has no duty to defend David Mara ("defendant" or "Mara") in a

separate pending state court civil action ("the underlying action").[1]   Doc. # 1 (Complaint for

Declaratory Judgment).  In that action, various members of  the Parks and Wrobel family

(collectively, "the Parks family"), additional defendants herein, seek to recover damages they

allegedly sustained as a result of racially-motivated intimidation and harassment by Mara.  At all

times relevant to the Parks' lawsuit, Mara was insured by Middlesex under a homeowner's insurance

---

[1] *Alton Parks et al. v. David A. Mara*, Docket No. HHD-CV06-5005257-S, was filed on
July 31, 2006 in the Connecticut Superior Court in the Judicial District of Hartford.

policy (hereinafter "policy" or "Middlesex policy").    Doc. ##18-1 and 18-2 (Middlesex Insurance Policy Nos. 37-69115-52Q and 37-69115-53Q).[2]    For reasons set forth below, Middlesex claims that the policy does not cover the damages allegedly sustained by the Parks family and thus Middlesex has no duty to defend.

Pursuant to Fed. R. Civ. P. 56 (c), plaintiff Middlesex moves for summary judgment on its claim for declaratory judgment. The Court summarizes the undisputed facts as follows.[3]    Alton Parks is an African-American male who resides with his family at 102 South Road in Enfield, Connecticut.[4]    Doc. #18-3 (Revised Complaint), First Count, ¶ 1.  He resides next door to defendant Mara, a White Caucasian male, who lives at 104 South Road, Enfield, Connecticut.  *Id.*, ¶ 6.  From the period of July of 2002 till August of 2003, Mara allegedly engaged in a series of  intimidating and harassing behaviors that caused the Parks family to initiate the underlying action.

---

[2]According to plaintiff, Middlesex issued Mara a series of four homeowner's insurance policies covering a period of "roughly five years, beginning in spring 2002 and running until mid-summer 2005."  Doc. #18, p. 1, para. 2.  The first policy was effective from 4/27/2002 to 4/27/2003; the second policy was effective from 4/27/2003 to 4/27/2004; the third policy was effective from 7/24/2003 till 7/24/2004; and the fourth policy covered from 7/24/2004 to 7/24/2005.  For the text of these policies, *see* Doc. ##18-1and 18-2.  On the dates of all alleged incidents involving Mara, as set forth by the Parks family in the underlying action, Mara was covered by these Middlesex homeowner's  policies.  This opinion Court refers to these policies collectively as  "the policy."

[3]The Court notes that the parties have failed to file their requisite Local Rule 56(a)1 and 56(a)2 Statements, setting forth their respective lists of undisputed material facts.  Although this is a glaring omission by the parties, the Court has found the undisputed facts based on the pleadings presented and the  parties' statement of facts in their memoranda on this motion for summary judgment.  Doc. ## 18 and 20.  The Court further notes that the core facts in this case are not in dispute and the issue on summary judgment is a question of law.

[4]Mr. Parks resides with his wife, Celese Parks, a White Caucasian female; his mother-in-law, Elouise Wrobel, a White Caucasian female; and his eighteen-year-old son, Jakob, and minor daughter, Emmantha, both of whom he fathered with Celese.  Doc. #18-3, First Count, ¶¶ 2-5.

The Revised Complaint in that action (hereinafter "Parks' complaint" or "complaint") contains ten counts against Mara:  (1) intimidation based on bigotry or bias pursuant to Conn. Gen. Stat. §52-571c; (2) invasion of privacy based on publicity that unreasonably places the other in a false light before the public;  (3) invasion of privacy based on unreasonable publicity given to another's private life;  (4) invasion of privacy based on unreasonable intrusion in seclusion; (5) voyeurism pursuant to Conn. Gen. Stat. §53a-189a;  (6) libel; (7) civil trespass; (8) private nuisance; (9) negligent infliction of emotional distress; and (10) intentional infliction of emotional distress.  Doc. #18-3 (Revised Complaint).[5]

Middlesex is presently defending Mara in the underlying action under a reservation of rights, claiming that it has no duty to defend.  Middlesex now moves this Court for summary judgment, seeking a declaration as to all defendants (i.e.,  Mara and the Parks family) that it has no duty to defend.  Middlesex contends that the Parks' complaint consists entirely of allegations of intentional acts and that such acts are expressly excluded from coverage under the terms of the homeowner's policy.  Doc. #18 (Plaintiff's "Motion For Summary Judgment").[6]

_____

[5]The Court notes that Mara was arrested and pled guilty in criminal court in Enfield, Connecticut, on July 25, 2003, to criminal charges for Intimidation due to Bias in the 3rd Degree (Conn. Gen. Stat. §53a-181l), stemming from Mara' intimidation and harassment of the Parks family in July of 2003.  He received a one-year suspended prison sentence and three years of probation.  *See State of Connecticut v. Mara*, Doc. No. H13W-CR03-0128683-S.

[6]Specifically, Middlesex contends that each of the ten counts in the Revised Complaint describes "injurious acts directed by Mara at the Parks defendants and their property" that were "motivated by a racial bias against the Parks defendants."  Doc. #1, ¶ 16.  These acts included, *inter alia*,  the painting of racial epithets on Mara's truck, setting off bottle rockets adjacent to the Parks' property, heaping rotting garbage on the border of the Parks' property, and installing and using a video surveillance system to intrude on the Parks' privacy.  *Id.* at ¶ 17.  As a result of these injurious acts, the Parks allege they have suffered "mental anguish, constant fear, injury to reputation, loss of appetite, interference with quiet enjoyment of their property, and financial damage brought on by the necessity of prosecuting the Underlying Action against Mara."  *Id.* at

By its terms, the Middlesex policy provides liability coverage for "bodily injury" or "property damage" caused by an "occurrence," which is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in bodily injury or property damage." Doc. #18-1, p. 6 ("Definitions," ¶5) and p. 15, Section II.E. ; and Doc. #18-2, p. 13 ("Definitions," ¶5) and p. 21, Section II.E. The policy expressly excludes coverage for bodily injury or property damage "which is expected or intended by the insured." Doc. #18-1, p. 16, Section II.1.a.; and Doc. #18-2, p. 22, Section II.1.a . Middlesex points to these key provisions to argue that the policy does not cover the liability alleged in the complaint because each of the ten counts explicitly alleges intentional conduct, causing anticipated, "expected and/or intended," injurious results to the Parks family. Doc. #1, ¶ 27. None of the counts allege that the Parks family suffered damages as the result of an accident. *Id.* at ¶ 26.

Upon review and examination of the policy language, the factual allegations contained in the Parks' complaint, and the undisputed facts, the Court concludes that plaintiff Middlesex has established that it has no duty to defend Mara in the underlying action. There is no genuine issue of material fact and Middlesex is entitled to judgment as a matter of law. Summary judgment will be granted for the reasons set forth below.

II.    DISCUSSION

A.    Jurisdiction

This Court exercises subject matter jurisdiction over the present action based on diversity of citizenship under 28 U.S.C. § 1332. There is complete diversity of citizenship between plaintiff

¶ 18.

Middlesex and all defendants and the amount in controversy exceeds $75,000.[7]   This Court has

jurisdiction to render declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201.

B.      Declaratory Judgment

Plaintiff requests that this Court render declaratory judgment under the Declaratory Judgment

Act ("DJA"), 28 U.S.C. §2201.[8]   An action for declaratory judgment must meet the "case or

controversy" requirement in that it "must be sufficiently real and immediate, allowing specific and

conclusive relief . . . and be ripe for adjudication." *Pub. Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S.

237, 244 (1952).  Under the DJA, the district court retains discretion to determine whether it will

exercise jurisdiction over the action in question.  *See, e.g., Dow Jones & Co., Inc. v. Harrods Ltd.*,

346 F.3d 357, 359 (2d Cir. 2003).  In so doing, the court must consider "the litigation as a whole" and

whether "practicality and wise judicial administration will predominate." *U.S. Underwriters Ins. Co.*

*v. Kum Gang, Inc.*, 443 F. Supp.2d 348, 352-53 (E.D.N.Y. 2006) (citing *Gianni Sport Ltd., v.*

*Metallica*, 2000 WL 1773511, at *4 (S.D.N.Y. 2000) and *Wilton v. Seven Falls Co.*, 515 U.S. 277,

288 (1995)).

---

[7]Plaintiff Middlesex is a Wisconsin corporation with its principal place of business in Stevens Point, Wisconsin.   Defendants Mara and the Parks family are citizens of Connecticut, residing in the State of Connecticut.  Doc. #1, ¶¶ 1-7.

[8]28 U.S.C. § 2201(a) states in relevant part:

[A]ny court of the United States . . . may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought."

*See also* Fed. R. Civ. P. 57 (stating that "[t]hese rules govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201").

In the instant case, there is a clearly defined controversy between the parties as to whether the plaintiff insurer must defend Mara in the underlying action.   Middlesex is currently defending Mara under a reservation of rights, basically under protest.   Declaratory judgment would thus provide the parties with specific, conclusive relief in resolving whether Middlesex has a duty to defend. Furthermore, the issue of coverage under the homeowner's policy may not be properly litigated in the underlying action because Middlesex is not a named party in that suit.   "When a determination of the duty to defend can be made and thus clarify the insurer's obligations in the underlying tort action, the DJA is properly invoked."   *U.S. Underwriters Ins. Co.,* 443 F. Supp.2d at 353 (citing *Metropolitan Prop. & Liab. Ins. Co. v. Kirkwood*, 729 F.2d 61, 63 (1st Cir. 1984)).   The Court will therefore exercise jurisdiction to render declaratory judgment in this case.

C.    Standard for Summary Judgment

A court may properly address the merits of a declaratory judgment action through a motion for summary judgment.   *Community Action for Greater Middlesex County, Inc. v. American Alliance Ins. Co.*, 254 Conn. 387, 397-98 (2000).   Specifically, summary judgment is appropriate to determine whether an insurer owes a duty to defend on the basis of an insurance contract because construction of the contract presents a question of law for the court.   *See, e.g., Hansen v. Ohio Cas. Ins. Co.*, 239 Conn. 537, 543 (1996) ( "[c]onstruction of a contract of insurance presents a question of law for the court").

The standard to be applied on a motion for summary judgment in this Circuit is well- settled. Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material

fact and that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c) ; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)*; see also Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006)); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003); *Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir. 1993)*; McAnaney v. Astoria Fin. Corp.*, 2009 WL 3150430, at *6 (E.D.N.Y. 2009). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. School Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson,* 477 U.S. at 248*, cert. denied,* 506 U.S. 965, 113 (1992)).

When ruling on summary judgment, the court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Pearson Educ., Inc. v. Liao*, 2008 WL 20734991, at *2 (S.D.N.Y. 2008) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)); *see also Aldrich,* 963 F.2d at 523. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. ), *cert. denied,* 502 U.S. 849 (1991)*; see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992)*.*

Summary judgment is proper when, after drawing all reasonable inferences in favor of the non-movant, no reasonable trier of fact could find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *see also Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. )*, cert. denied,* 502 U.S. 849 (1991).

In insurance cases, summary judgment may be granted as to the extent of coverage as a matter of law. *Jurrius v. Maccabees Mut. Life Ins. Co.*, 587 F. Supp. 1301, 1305 (D. Conn. 1984); *see also American Home Assur. Co. v. Abrams*, 69 F. Supp. 2d 339, 348 (D. Conn. 1999) ("interpretation of

the language in an insurance contract is a matter of law to be decided by the Court").  Therefore, in

an insurance case, "[i]t is the function of the court to construe the provisions of the insurance contract

and, if no material facts are at issue, the question of whether coverage exists is a question of law that

is appropriately decided on a motion for summary judgment."  *Peerless Ins. Co. v. Disla*, 999 F.

Supp. 262, 263 (D. Conn. 1998).

    In the present case, it is Middlesex's position that no issue of material fact exists as to its

claims that:  (1) Middlesex's homeowner's insurance policy with Mara  covered liability for bodily

injury or property damage resulting only from an "occurrence" (i.e., an "accident," which is an

unforeseen and unintended event), (2) that policy expressly excludes coverage for damages that are

"expected or intended by the insured," (3) the acts imputed to Mara in the Parks's complaint were all

intentional and thus do not constitute an "occurrence" for purposes of liability coverage under the

homeowner's policy; and (4) the alleged injuries incurred by the Parks family were further excluded

under the policy because they were  "expected or intended" by Mara.   Middlesex thus contends that,

as a matter of law,  it owes no duty to defend or indemnify Mara in the Parks litigation and summary

judgment should be granted.


D.    Choice of Law

    A federal court sitting in diversity applies the forum state's conflict of law rules to determine

which  state's substantive law governs the dispute. *Klaxon Co.  v. Stentor Co.*, 313 U.S. 487, 496

(1941).  For issues of contract interpretation, Connecticut applies the test set forth in the Restatement

(Second) of Conflicts of Law ("Restatement") § 188, which, absent an effective choice of law by the

parties,  applies the law of the state with the "most significant relationship" to the transaction and the

parties. [9]   *Reichold Chems. Inc. v. Hartford Accident and Indem. Co.,* 252 Conn. 774, 781 (2000) (a/k/a "*Reichold II*").

With respect to liability insurance contracts in particular, Connecticut recognizes a rebuttable presumption in favor of the state "where the insured risk is located."   *Reichold II*, 252 Conn. at 782 (citing § 193 of the Restatement (Second), recognizing rebuttable presumption in favor of applying law of state "which the parties understood was to be the principal location of the insured risk").   *See also  Lumbermens Mut. Cas. Co. v. Dillon Co. Inc.*, 2000 WL 1336498, at *2-3 (D. Conn. 2000) (applying *Reichold II* to hold "'most significant interest' test mandates that, in the absence of *extraordinary* circumstances, the law of the state where the principal insured risk is located will apply").

The Court applies the law of the State of Connecticut to this homeowner's insurance policy because Connecticut has the "most significant interest" in this policy.  Applying *Reichold II*, one must conclude that Connecticut is the location of the subject matter (i.e., Mara's home at 104 South Road, Enfield, Connecticut) and thus the risk of liability covered by the contract.    In further support, and in accordance with the traditional factors set forth in Restatement § 188, Connecticut is the place where the contract was entered into and executed (through the Baio Insurance Agency of East Windsor, Doc. ##18-1, p. 3), and the location where all of the defendants (Mara & the Parks family) reside.  Although the parties make no reference to "choice of law" in their memoranda on the present

---

[9]Section 188 lists five relevant contacts to be considered when determining which state has the "most significant relationship" to the contract:  "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties."  Restatement (Second) Conflicts of Laws § 188 (2)(e). Section 188 also incorporates by reference seven  more generalized choice-of-law principles.

motion, both Middlesex and Mara cite Connecticut case law throughout, thereby manifesting their understanding that substantive Connecticut law governs this case.


E.      Insurance Policy Provisions at Issue

The plaintiff has presented the text of the Middlesex policy provisions to prove the policy does not cover intentional acts of the insured.   Section II, captioned, ""Liability Coverages," describes an event for which liability for "bodily injury" or "property damage" is covered as an "occurrence."[10] The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: (a) Bodily injury; or (b) Property damage."  *See* Doc. #18-1, p. 6 ("Definitions," ¶5) and Doc. #18-2, p. 13  ("Definitions," ¶5).

Moreover, separate policy provisions create an exception to liability coverage for intentional actions.  "Section II - Exclusions," thus states:

    1.      Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not
            apply to "bodily injury" or "property damage":

-------

[10]Section II, "Liability Coverages,' Coverage E ("Personal Liability"), states in relevant part:

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "*occurrence*" to which this coverage applies, we will:

        1.      Pay up to our limit of liability for the damages for which the "insured" is
                legally liable. . . .
        2.      Provide a defense at our expense by counsel of our choice, even if the suit
                is groundless, false or fraudulent. . . ."

Doc. #18-1, p. 15, Section II.E. 1-2 (emphasis added); and Doc. #18-2,  p. 21,  Section II.E. 1-2 (emphasis added).

(A) Which is expected or intended by the "insured" . . . .

Doc. #18-1, p. 16, Section II.1.a; and Doc. #18-2, p. 22, Section II.1.a.

F.      Construction of Insurance Policy Under Connecticut Law

In Connecticut, insurance policies are construed according to general rules of contract interpretation.   They are thus "enforced in accordance with the parties' intent, as derived from the plain and ordinary meaning of the policy's terms."  *Allstate Ins. Co. v. Quito*, 2007 WL 2221163, at *3  (D. Conn. 2007) (citing *Ohio Cas. Ins. Co. v. Dentek, Inc.*, 283 F. Supp.  2d 655, 659 (D. Conn. 2003)).   The primary rule is that "the Court must read the policy language as a layman, rather than [as] an experienced underwriter" and should not "torture words to import ambiguity" where none exists. *Jurrius*, 587 F. Supp. at 1305.

It is well settled that "exclusions from insurance policy coverage are given strict construction." *Timmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir. 1994). *See also State of New York v. Blank*, 27 F.3d 783, 788  (2d Cir.1994); *U.S. Underwriters Ins. Co.,* 443 F. Supp.2d at 356.  Policy exclusions are interpreted in a manner most beneficial to the insured.  *MH Lipiner & Son, Inc. v. Hanover Ins. Co.*, 869 F.2d 685, 687 (2d Cir. 1989).  Any  "ambiguous words or phrases in an insurance policy are construed strictly against the insurance company and in favor of coverage." *Clinton v. Aetna Life & Sur. Co.*, 41 Conn. Sup. 560, 563 (Conn. Sup.1991) (citing *G. Richards, Law of Insurance* (6th Ed. Freedman) § 11.2(f), pp. 250-51); *accord McCauley Enterprises, Inc. v. New Hampshire Ins. Co.*, 716 F. Supp.718, 720  (D. Conn. 1989).   "The test of coverage is not what the insurer intended to cover but what a reasonable person in the position of the insured would understand to be covered."  *Clinton*, 41 Conn. Sup. at 563 (citation omitted).

11

Focusing on the insurer's duty to defend, the Connecticut Supreme Court set forth the proper analysis of the policy's language in *Hartford Casualty Insurance Co. v. Litchfield  Mutual Fire Ins. Co.*, 274 Conn. 457, 463  (2005) :

> It is the function of the court to construe the provisions of the contract of insurance.... The [i]nterpretation of an insurance policy ... involves a determination of the intent of the parties as expressed by the language of the policy ... [including] what coverage the ... [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy ... [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . .

(Internal citations and quotations omitted).  *Accord Taylor v. Mucci*, 288 Conn. 379, 383 (2008) ("If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . .   Under those circumstances, the policy is to be given effect according to its terms.") (internal quotations and citations omitted).

After examining the words of the Middlesex policy, the  Court concludes that the language is clear and unambiguous.  It states that liability coverage for "bodily injury" or "property damage" is limited to damages caused by an "occurrence" and defines the term "occurrence" as an "accident."  Doc. #18-1,  p. 6 ("Definitions," ¶5) and p. 15, Section II.E.1-2; Doc. #18-2, p. 13  ("Definitions," ¶5) and  p. 21, Section II.E.1-2.   The policy thus exclusively covers accidents.

The Connecticut common law definition of  "accident" focuses on lack of intent.  The Connecticut Supreme Court has defined the term "accident" as an "unintended," "unexpected," or "unforeseen, unplanned" event or condition.  *See, e.g.,  Hammer v. Lumbermen's Mut. Cas. Co.*, 214 Conn. 573, 590 (1990) (accident is  "an unintended occurrence"); *Commercial Contractors Corp. v.*

*Am. Ins. Co.*, 152 Conn. 31, 42 (1964) (accident is "an unexpected happening").  *See also Palace Laundry Co. v. Hartford Acc. & Indem., Co.*, 27 Conn. Supp. 222, 229 (Conn. Com. Pl. 1967) ("'Accident' is a word of broad scope and includes many unfortunate occurrences not anticipated in the ordinary course of affairs. The wilful act is not embraced by the word")  (citing  *Hardware Mut. Ins. Co. v. C. A. Snyder, Inc.*, 242 F.2d 64, 68 (3d Cir.1957)).

   Moreover, in ordinary language, an "accident" is commonly defined as an unforeseen and unplanned event or circumstance. *See*, *e.g.*, Black's Law Dictionary (8th Ed. 2004) (defining "accident as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated");  Webster's Third New International Dictionary (1986) (defining "accident" as "an event of unfortunate character that takes place without one's foresight or expectation"); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 29, at 162 (5th ed. 1984) ("accident is an occurrence which was not intended and which, under all the circumstances, could not have been foreseen or prevented by the exercise of reasonable precautions").

   Reading the Middlesex policy definition of "occurrence" as an "accident," a reasonable person in the position of the insured would understand that a covered "occurrence" is an  unintended, unexpected, or unplanned event, an understanding confirmed when the reasonable person then reads the policy's express exclusion of coverage for bodily injury or property damage "expected or intended by the insured."  Doc. #18-1, p. 16, Section II.1.a; and Doc. #18-2, p. 22, Section II.1.a.  Giving these policy provisions their natural and ordinary meaning and reading the  provisions together, the Court finds that a reasonable person in Mara's  position would comprehend that intentional bodily injury or property damages inflicted on others would fall outside the policy's coverage.  Thus, Mara should not have reasonably anticipated coverage to extend to  racially-motivated acts of intimidation and

harassment.

The inquiry into the scope of Middlesex's duty to defend does not, however, end with interpreting the policy language.  That duty next hinges on the factual allegations contained in the Parks' complaint (Doc. #18-3).  The issue is whether those facts bring the injuries within the policy's coverage.  If the complaint possibly sets forth a cause of action within coverage, Middlesex must defend.  In the present circumstances, where the policy's language expressly excludes coverage for intentionally caused injuries, Middlesex has no duty to defend if Mara acted  intentionally to harm the Parks. We must therefore turn to the factual allegations contained in the complaint.

G.    Insurer's Duty to Defend Under Connecticut Law - Determined by the Allegations in the Underlying Complaint

Under the governing law of Connecticut, the Connecticut Supreme Court has indicated that an insurer's duty to defend is determined by the allegations contained in the underlying complaint.  *Hartford Casualty Ins. Co. v. Litchfield Mutual Fire Ins.*, 274 Conn. 457, 463 (2005).  The Connecticut Supreme Court in *Hartford Casualty* thus summarized as follows:

> In construing the duty to defend as expressed in an insurance policy, [t]he obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to defend, irrespective of the insured's ultimate liability.... It necessarily follows that **the insurer's duty to defend is measured by the allegations of the complaint.** . . .   Hence, if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend.

274 Conn. at 463 (emphasis added; internal citations and quotations omitted); *see also  Stamford Wallpaper Co. v. TIG Ins.*, 138 F.3d 75, 79 (2d. Cir. 1998) (the existence of a duty to defend is based solely on the information and allegations contained "within the four corners of the complaint").

Whether the plaintiff has a duty to defend depends on whether, in light of the policy language, the complaint in the underlying action alleges conduct for which coverage was provided. *Imperial Cas. and Indem. Co. v. State*, 246 Conn. 313, 323 (1998). *See also Missionaries of the Co. of Mary, Inc. v. Aetna Cas. & Sur. Co.*, 155 Conn. 104, 110 (1967). "The duty to defend an insured arises if the complaint states a cause of action which appears on its face to be within the terms of the policy coverage. Because the duty to defend has a broader aspect than the duty to indemnify . . . , [i]f an allegation . . . falls even *possibly* within the coverage, then the insurance company must defend the insured." *Imperial Casualty and Indem. Co.*, 246 Conn. at 323-24 (internal quotations and citations omitted; emphasis in original). [11]

"On the other hand, if the complaint alleges a liability which the policy does not cover, the insurer is not required to defend." *Community Action for Greater Middlesex County, Inc.*, 254 Conn. at 399; *Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 807-08 (1999); *Keithan v. Massachusetts Bonding & Ins. Co.*, 159 Conn. 128, 138 (1970).

Where, as here, the policy excludes coverage for damages resulting from intentional acts, the court examines the factual allegations to decide whether both intentional acts and intended results are

---

[11] *See also Community Action for Greater Middlesex County, Inc. v. American Alliance Ins. Co.,* 254 Conn. 387, 398 (2000) ("the insurer's duty to defend is measured by the allegations of the complaint . . . Hence, if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend"); *Flint v. Universal Machine Co.*, 238 Conn. 637, 646 (1996) ("The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage."); *Keithan v. Massachusetts Bonding & Ins. Co.*, 159 Conn. 128, 138 (1970) ("an insurer's duty to defend . . .is determined by reference to the allegations contained in the [underlying] complaint" )*; Clinch*, 110 Conn. App. at 34 ( "it is the claim which determines the insurer's duty to defend").

present.[12] *See, e.g., Amex Assur. Co. v. Horobin*, 22 Conn. L. Rptr. 280, 1998 WL 328428, at *2 (Conn. Super. 1998) ("To show an intentional act within the exclusion of a policy two elements are necessary: (1) the insured must have intended to commit the act and (2) to commit the injury that resulted.").[13]

Moreover, the Connecticut courts have long "eschewed the notion that pleadings should be read in a hypertechnical manner." *Clinch v. Generali-U.S. Branch*, 110 Conn. App. 29, 37 (2008). They thus read the complaint "in a manner that advances substantial justice," construing it "reasonably" to contain all that it may "fairly mean." *Id.*

The result is that even when an action is pled as an unintentional tort (e.g., negligence), the

---

[12]The logic in coupling intentional acts with intended results is apparent. The average citizen engages in many purposeful activities each day without creating intentional harm. For example, walking is a daily action which one intends to do. Moreover, sometimes while walking, one might inadvertently, perhaps in a crowd, step on another's foot, thereby causing him injury. Resulting injury in those circumstances would likely be characterized as an "accident" where it was neither expected nor intended. If, on the other hand, a defendant were to walk up to his neighbor with the sole purpose of stepping onto his foot and thereby causing him injury, the totality of the defendant's actions would be deemed an "intentional act" and not an "occurrence" as described in the Middlesex policy.

Furthermore, it is the allegations in the complaint that are determinative and not the merits of those allegations. The key is what the plaintiffs in the underlying action might be able to prove, not will prove. The ultimate success of the underlying action is irrelevant for determining whether the insurer has the duty to defend. *See, e.g.*, *QSP, Inc. v.. Aetna Casualty & Surety Co.*, 256 Conn. 343, 352 (2001) (for purposes of determining insurer's duty to defend, the allegations in the complaint prevail – i.e., it is irrelevant whether "facts outside the four corners of [the complaint] . . . indicate that the claim may be meritless or not covered"); *see also Imperial Casualty and Indemnity Company v. State*, 246 Conn. 313, 323-24 (1998).

[13]*See also Suarez v. Dickmont Plastics Corp.*, 229 Conn. 99, 108-09 (1994) ("A result is intended if the act is done for the purpose of accomplishing such a result or with knowledge that to a substantial certainty such a result will ensue ... Both the act producing the injury and the resulting injury must be intentional."); *Markey v. Santangelo*, 195 Conn. 76, 77 (1985) ("[n]ot only the action producing the injury but the resulting injury must be intentional).

court examines the alleged activities in the complaint to determine whether the insured intended to commit both the acts and the injuries that resulted.  If so, regardless of the title of the action, the court holds the action to be outside the coverage of the policy.  *See, e.g.*, *State Farm Fire & Cas. Co.,* 1997 WL 309584, at * 5 (Conn. Super. 1997) (where alleged actions were striking victim multiple times on face and body, "reason mandates that from the very nature of the act[s], harm to the injured party must have been intended")(citation omitted);  *Clinch*, 110 Conn. App. at 39 (holding insurer has no duty to defend negligence action where "negligent acts [described] . . . are tied inextricably . . . to assault and battery").

Furthermore, harmful intent may be inferred at law in circumstances where the alleged behavior in the underlying action is so inherently harmful that the resulting damage is unarguably foreseeable.  *See, e.g., United Services Auto. Ass'n. v. Marburg,* 46 Conn. App. 99, 104 (Conn. App. 1997) (defendant's intent to harm victim could be presumed as a matter of law where she allegedly knew victim's age as a  minor and engaged in sexual misconduct with him)*; accord  Middlesex Mutual Assur. Co. v. Favreau*, 2003 WL 22234621, at *7 (Conn. Super. 2003); *Middlesex Mutual Assur. Co. v. Rand*, 1996 WL 2218698, at *2-3 (Conn. Super. 1996).[14]

--------

[14]In such cases, in order to destroy the presumed inference of harmful intent, the insured must do more than assert that no harm was intended.  He must actually produce evidence to prove that fact.  *Middlesex Mutual Assur. v. Favreau*, 2003 WL 22234621, at *6-7 (absent production of reliable evidence to the contrary, defendant was presumed to possess intent to harm victim so insurer owed no duty to defend or indemnify); *see also Middlesex Mutual Assur. Co. v. Hitchcock*;  2000 WL 288279, at *3 (Conn. Super. 2000) (defendant's claim that he had no intent to make harassing, obscene phone calls due to his alcoholism and blackouts was insufficient to destroy finding of intent where he presented no evidence to support that assertion).

H.    <u>Policy Exclusion for "Intentional Acts"</u>

Case law is clear that where the provisions in the insurance policy expressly exempt intentional acts of an insured from coverage, the court will grant summary judgment in favor of the insurer who relies upon such exemption. *See, e.g.*, *Middlesex Mut. Assur. Co. v. Hitchcock*; 2000 WL 288279, at *2 (Conn. Super. 2000) (summary judgment granted to insurer, holding insurer had no duty to defend where defendant's series of harassing and obscene telephone calls to plaintiff "did not constitute an 'occurrence' covered by defendant's insurance policy with the plaintiff" because such calls could not be deemed an accident even if defendant had no present recollection of them) ; s*ee also  Moore v. Continental Casualty Co.*, 252 Conn. 405, 408 (2000)  (in analyzing counts in underlying action, Connecticut  Supreme Court concluded  "[i]t is undisputed that [the intentional] counts do not trigger a duty to defend under the plaintiff's homeowner's insurance policy because they are excluded under the policy's 'expected or intended' exclusion.") .

I.    <u>Analysis of Factual Allegations  in the Parks' Complaint</u>

Plaintiff Middlesex contends that it has no duty to defend Mara in the underlying action because every count alleged in the Parks' complaint describes actions that "were all intentionally committed" and liability for such intentional acts is expressly excluded from coverage under the homeowner's policy.  Doc. #18 (Plaintiff's "Motion For Summary Judgment"), p. 3, para. 2. Middlesex points out that the complaint does not allege that the Parks family incurred any injury as the result of an accident.  Doc. #1, ¶ 26.  Rather, it alleges "that each and every injury allegedly incurred by the Parks defendants was expected and/or intended by Mara." *Id.* , ¶27

The complaint in the underlying action contains ten counts against Mara.  Under Connecticut

law, when a complaint alleges several causes of action or theories of recovery against the insured, a

duty to defend will arise if *any* of those causes falls within the coverage of the policy.  *See, e.g.,*

*Clinton v. Aetna Life & Sur. Co.*, 41 Conn. Sup. 560, 563 (Conn. Sup. 1991).  This Court must

therefore consider each cause of action to determine whether coverage applies to any of them.

The counts include:   (1) intimidation based on bigotry or bias pursuant to Conn. Gen. Stat.

§52-571c; (2) invasion of privacy based on publicity that unreasonably places the other in a false light

before the public; (3) invasion of privacy based on unreasonable publicity given to another's private

life; (4) invasion of privacy based on unreasonable intrusion in seclusion;  (5) voyeurism pursuant to

Conn. Gen. Stat. §53a-189a;  (6) libel; (7) civil trespass; (8) private nuisance; (9)  negligent infliction

of emotional distress; and (10) intentional infliction of emotional distress.  Doc. #18-3 (Revised

Complaint).

In reviewing the factual allegations comprising each count, the Court concurs with Middlesex

that each count is based on Mara's racially-motivated, intentionally injurious actions towards the

Parks family and their property.  Doc. #1, ¶ 16.  These acts included, *inter alia*, lighting bottle rockets

directed at the Parks' property, despite repeated requests to cease and desist (Doc. #18-3, First Count,

¶¶ 8-10); painting racial epithets on Mara's truck in an effort to direct them at the Parks family (*Id.*,

¶¶ 13-21),[15] making obscene gestures to the Parks, including but not limited to giving them the

---

[15]On July 5, 2003, Mara allegedly wrote "NIGGER" in large white letters on the left side
of his truck so that members of the Parks family and neighbors passing by would read it.  He also
wrote on the truck, "BLACK DICK + WHITE GIRL = GOAT GIRL (SLUT)," directed at
Emmantha Parks in reference to her parents' different races.  At that time, Mara had  parked his
pickup truck on top of a car trailer in his backyard (to use the truck as a "billboard").  The truck
was thus elevated so that the Parks could clearly read the epithets over their wooden fence and
from the rear porch of their property.  Doc. #18-3, First Count, ¶¶13-21, Second Count, ¶¶ 1-40,
Third Count, ¶¶ 1-43, and  Sixth Count, ¶¶ 1-62.

"middle finger" gesture (*Id.*, ¶ 22),[16] telling Jakob Parks that he and his father are "stupid" and that

his mother and grandmother are "bitches" (*Id.*, ¶ 23); informing the Parks that he will "see to it that

they will 'move in one day and move out the next'" (*Id.*, ¶ 23); telling "vicious lies" about Jakob and

Emmantha Parks in an attempt to intimidate and harass the entire Parks family (*Id.,* ¶ 24); causing

"deadly, metal tipped arrows" to be shot into the Parks' backyard and into their shed to intimidate

them (*Id.*, ¶ 25); standing on the bed of his truck to glare at Emmantha while she was swimming in

the family pool in her backyard (*Id.* ¶ 27);[17] voyeuristically videotaping and recording the image of

Emmantha Parks in an effort to "arouse or satisfy his sexual desire" and invade her privacy ( *Id.*, Fifth

Count, ¶¶ 56-58); heaping garbage on the border of the Parks' property and allowing it to rot for five

to six weeks at a time, thereby depriving the Parks of the use and enjoyment of their backyard (Eighth

Count, ¶¶ 1-77); and installing and using a video surveillance system to intrude on the Parks' privacy,

invade their property, and specifically to "peep" into Emmantha's bedroom (*Id.*, Fourth Count, ¶¶ 49-

55;  Seventh Count, ¶¶ 1-73). [18]

       As a result of Mara's injurious acts, the Parks allege they have suffered "fear, harassment, loss

of sleep, persistent crying, loss of appetite, anxiety and mental anguish, along with financial damage

---

[16]Mara allegedly even gave this offensive gesture to the elderly, widowed Elouise Wrobel. Doc. #18-3, ¶22.

[17]Mara's offensive and repeated staring has allegedly resulted in Emmantha's teenaged girlfriends being forbidden by their parents to swim in the Parks' swimming pool.  Doc. #18-3, First Count, ¶26; *see* also *Id.*, Fourth Count, ¶¶ 1-48.

[18]This video camera purportedly had a motion sensor and would begin taping whenever there was movement within the bedroom of teenaged Emmantha Parks.  Doc. #18-3, Fourth Count, ¶ 50; Fifth Count, ¶¶ 1-59.

in having to retain an attorney to prosecute a civil action against the defendant."[19]  *Id.*, ¶ 29.

As stated *supra,* [20] Connecticut courts examine the factual allegations within the four corners of the complaint to determine which has occurred:   (1) an intentional act, yielding intended or expected damage,  or (2) a non-intentional accident.  Wilful acts in an effort to cause harm are not "accidents."   The Parks family's complaint against Mara is an unbroken compendium of injurious acts directed against them, causing anticipated, expected and intended harm.  The Court concludes without difficulty that no accidents are alleged in the underlying action.

A review of the allegations in all ten counts of  the complaint reveals that all of Mara's alleged  actions  were  intentional  in  both  commission  and  result.    Not  only  were  the  actions themselves intentional, but the resulting harm was foreseeable, expected, and intended.  The outrageous and virulent nature of many of Mara's alleged actions compel the inference that they were motivated by his admitted racial bias.[21]

---

[19]For additional, extensive lists of  injuries to Elouise Wrobel, Celese Parks, and Alton Parks, *see* Doc. #18-3, First Count, ¶¶ 30-32.

[20]*See* discussion *supra* in Section II. F.-H.

[21]The Court notes that Mara was arrested and pled guilty in criminal court in Enfield, Connecticut, to criminal charges for Intimidation due to Bias in the 3rd Degree (Conn. Gen. Stat. §53a-1811), arising from his intimidating and harassing  activities on July 5, 2003.  Doc. #18-3 (Order of Probation).   He received a one-year suspended prison sentence and three years of probation.  *See State of Connecticut v. Mara*, Doc. No. H13W-CR03-0128683-S.

Conn. Gen. Stat. § 53a-181l, entitled "Intimidation based on bigotry or bias in the third degree: Class A misdemeanor" states:

(a) A person is guilty of intimidation based on bigotry or bias in the third degree when such person, *with specific intent to intimidate or harass another person or group of persons because of the actual or perceived race*, religion, ethnicity, disability, sexual orientation or gender identity or expression of such other person or persons: (1) Damages, destroys or defaces any real or personal property, or (2) threatens, by word or act, to do an

Each count after the First Count in the Parks' complaint incorporates by reference the facts set forth in the First Count. Moreover, each count sets forth additional intentional actions in support of the Parks' claims. Thus each count is based on a panoply of Mara's intentional actions, falling outside the coverage of the Middlesex policy. Moreover, the Ninth Count, although captioned as "negligent infliction of emotional distress," is actually based on a series of intentional, patently harmful acts of Mara, as set forth in totality in ¶¶ 1-87 of the Revised Complaint.[22] Doc. 18-3, Ninth Count, ¶¶ 1-8 . The Ninth Count thus creates no duty by Middlesex to defend.

J.    Mara's Objections to Middlesex's Motion for Summary Judgment

1.    Contract Interpretation

Mara focuses on the distinction between intentional acts and intentional results to contend that there are "issues of material fact as to what constitutes an 'occurrence' within the meaning of the contract language, whether it is the act of the Defendant or the consequences/results of such act." Doc. #20, p. 1, para. 1. Mara thus "takes issue with Middlesex's interpretation and application of the relevant terms of the contract language," specifically whether any of the allegations in the underlying complaint constitute "occurrences" under the insurance contract. *Id.*, p. 2, para. 3.

_____

act described in subdivision (1) of this subsection or advocates or urges another person to do an act described in subdivision (1) of this subsection, if there is reasonable cause to believe that an act described in said subdivision will occur.

(emphasis added). By pleading guilty to this offense, Mara admitted that he acted with intent to intimidate, harass, and harm the Parks family because of their race.

[22]For further discussion of the interpretation of negligence claims when determining whether there is a duty to defend, *see infra* Part. II. J.4.a.   Also, for a discussion of inherently dangerous actions giving rise to the presumption of harmful intent, *see* Part II.G., p. 17, *supra*.

As stated above, the interpretation of the insurance contract is a question of law to be decided by the Court. *See, e.g.*, *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 274 Conn. 457, 463 (2005) ("It is the function of the court to construe the provisions of the contract of insurance.").[23] It is within the court's province to interpret that language, giving the words their natural and ordinary meaning, to determine what a reasonable insured under the contract would expect to be covered. *Id.* It is not Mara's subjective intention for coverage that dictates the terms of coverage. It is thus of no import whether he planned to engage in harassing behavior toward his neighbors and subjectively expected his homeowner's policy to cover any ensuing damages.

This Court has interpreted the Middlesex policy as a matter of law. The policy language is clear. The Court finds that the policy excludes coverage for intentional acts, which foreseeably result in bodily injury and property damages. No material issue of fact can thus exist as to the policy's meaning.

2.     "Intentional Acts" Exclusion under Connecticut Law

Mara attempts to create a factual issue by arguing that even if his alleged actions were intentional, the results he created were not necessarily intended. Doc. #20, p. 1, para. 1. He thus claims that there is "an issue as to whether the intention of the Defendant in his acts, constitute per se an intentional consequence/result." *Id.* Thus, this contention concludes, if there is any doubt as to Mara's intentions, there is a disputed issue as to whether the injuries allegedly sustained by the Parks

---

[23] *See also Travelers Ins. Co. v. Namerow*, 257 Conn. 812, 827 (2001) ("construction of a contract of insurance presents a question of law . . ." for the court). *Accord  Am. Home Assur. Co. v.. Abrams*, 69 F. Supp. 2d 339, 348 (D. Conn. 1999) ( "Generally, the interpretation of an insurance contract is a matter of law to be decided by the Court.").

family were "occurrences" under the Middlesex policy.

This contention fails because, under Connecticut law, it is for this Court to determine whether the alleged injuries in the complaint constitute "occurrences" under the policy and thus give rise to the insurer's duty to defend. *See, e.g.*, *Hartford Casualty Ins. Co.*, 274 Conn. at 463, and discussion *supra* Section II.G. Where, as here, the insurance policy excludes coverage for damages resulting from intentional acts, it is for the Court to examine the factual allegations and decide whether both intentional acts and intended results are present. *See, e.g., Amex Assur. Co.,* 1998 WL 328428, at *2, and discussion *supra* Sections II.G.-I.

In the present case, the Court has examined the allegations in each count and found that Mara engaged in intentional activities and caused intended harm. These actions were motivated by racial hatred and the desire to cause harm - namely to intimidate, harass, insult, voyeuristically spy on, and otherwise upset his neighbors. Many of the actions were so extreme and outrageous in nature, they were inherently harmful, giving rise to a conclusion of inferred intent.[24]

As set forth *infra,* Mara has presented no evidence to rebut the finding that he acted without intent to harm the Parks. Rather, he has simply made bald assertions that the intent behind his actions is subject to various interpretations as to his motive. Such baseless and conclusory assertions create no genuine issue of material fact.

---

[24]Furthermore, additional evidence presented supports such a finding of intent. Mara pled guilty to the charge of Intimidation due to Bias in the 3rd Degree (Conn. Gen. Stat. §53a-1811) stemming from incidents occurring on July 5, 2003, as alleged by the Parks family in the underlying action. Doc. #18-3 (Order of Probation indicating that Mara received a one-year suspended prison sentence and three years of probation). Also, on July 5, 20003, at the time of his arrest, Mara reportedly shouted at the police, "Yeah, I did it. I was pissed off. I thought I could do it because this is my yard." Doc. #18-3, First Count ¶ 20. In August of 2003, Mara allegedly told Parks that he would "see to it that they [the Parks family] will 'move in one day and move out the next.'" *Id.* ¶ 23

3.      Incidents Where Mara Denies Intent

Mara points to particular incidents alleged in the Parks' underlying action to assert that he did not intend to cause harm.   For example, on July 5, 2002, when he allegedly  lit bottle rockets adjacent to the Parks' home, he states that  he merely intended "brief light and noise.  No other result was intended.  If a disturbance resulted or some fright was experienced, that was 'accidental,' . . . an occurrence under the terms of the insurance contract."  Doc. #20, p. 4, para. 4.   This assertion directly contradicts the Parks' claim that when Mara lit the bottle rockets, Celese Parks became alarmed and spoke to  Mara to ask him to cease and desist.   Despite her entreaties, Mara resumed the activity unabated.  Doc. #18-3, First Count, ¶¶ 9-10.  Mara was thus fully aware that lighting bottle rockets was causing his neighbor Celese Parks emotional distress, yet he purposefully resumed lighting the rockets.

Similarly, Mara points to the private nuisance claim in the Eighth Count to suggest that his admittedly "distasteful" acts of "lighting firecrackers, the backyard use of a fire pit, allowing garbage to accumulate at the side of the driveway beside a fence, accumulating what is described as 'junk' . . . and erecting and maintaining a 'shack'" may all be "characterized as the peaceful use and enjoyment of one's property."  Doc. #20, p. 5, para. 2.   The fact that they caused harm to the Parks family was thus  "accidental." [25]   *Id.*

In the present case, however, the cause of action framed as "private nuisance" is actually based

───────────────────

[25]Mara's  so-called "distasteful" activities were extreme in nature in that they included, but were not limited to:  heaping garbage on the Parks' border and allowing it to rot for approximately five to six weeks, giving rise to horrible odors; piling junk and debris (e.g., abandoned vehicles, sinks bathtub, rusty barrels, etc.), thereby attracting rodents and vermin; and burning fires in his backyard, creating thick smoke and strong offensives smells to waft over to the Parks property).  Doc. #18-3, Count Eight, ¶¶ 1-81.

on a long list of alleged intentional actions.[26]   The Eighth Count incorporates by reference a host of alleged intentionally harmful acts,  pled in the foregoing counts.  Doc. 18-3, Eighth Count, ¶¶ 1-73. Mara's so-called "distasteful" activities are thus the "tip of the iceberg" with respect to the factual bases for the "nuisance" claim.[27]

Second, Mara's argument that he was merely attempting to enjoy his property strains credulity in light of his repeatedly expressed intention to intimidate and harass the Parks family due to racial bigotry.  Each action, although blatantly noxious in nature, might not under other circumstances be deemed intentionally harmful.   However, examining the complaint as written and viewing Mara's activities as a whole, such behavior merely comprises a portion of his campaign to intimidate and harass his neighbors into moving.  The sum total of such actions (e.g., lighting bottle rockets, heaping rotting garbage near the Parks' property for five to six weeks at a time, and shooting metal-tipped arrows) is harassing (to put it mildly).  Mara's expressed desire to harm the Parks, combined with the totality of his admittedly "distasteful" activities, leads this Court to conclude that resulting harm was no accident.  Mara's alleged acts manifest his intent to injure the Parks family.  It follows that his acts and their intended consequences cannot be characterized as accidental, unexpected occurrences within the meaning of the policy in suit.

In addition, Mara has produced no evidence to show that he did not actually intend to cause harm.  Rather, as stated above, he merely makes bald assertions that at least some of his actions can be interpreted as caused by other motives (e.g., to peacefully enjoy his property).

---

[26]In Connecticut, a "private nuisance" action may include " unreasonable or unlawful" use of the land.  *See, e.g.*, *Filisko v. Bridgeport Hydraulic Co.,* 176 Conn. 33, 35-36 (1978) (setting forth necessary elements to prove "private nuisance").

[27]For a partial list of Mara's many harmful actions, *see* Section II. I., *supra.*

To establish the existence of a material fact, "conclusory allegations," "bald assertions," and "metaphysical doubt" will not suffice.  *See, e.g., BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996)  (it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts");  *Heublein, Inc. v. United States* , 996 F.2d 1455, 1461 (2d Cir. 1983)  ("Genuine issues of fact are not created by conclusory allegations.");  *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ("defendants' bald assertion, completely unsupported by evidence, did not satisfy their burden" to overcome properly supported summary judgment motion).

The evidence in this case shows that Mara admitted on numerous occasions that he intended to harm the Parks.[28]   His comments, combined with his guilty plea, bolster this Court's finding that his actions were intentionally malicious and designed to create harm.  By his own actions, he has shown that his bald assertions are false.  In light of the foregoing, this Court holds that Mara has not proven the existence of any genuine issue of material fact as to whether his actions were motivated by harmful intent –  namely to insult, intimidate, upset, harass and otherwise harm the Parks family.

4.      Mara's Contention of Problems and Deficiencies in Pleading - Negligence (Ninth Count), Invasion of Privacy (Second and Third Counts) and Libel (Sixth Count)

Mara points to four specific counts in the underlying action to claim that these alleged actions do not plead the requisite intent to cause harm.  An insurer has the duty to defend if the complaint sets forth *any* cause of action within the coverage of the policy.

---

[28]*See* footnote #24, *supra,* for a list of Mara's admissions of intent.

27

a.    Negligence (Ninth Count)

First, Mara argues that "[i]f intended conduct precludes coverage, . . . Count IX, alone, of the Parks/Wrobel complaint which alleges '*Negligent* Infliction of Emotional Distress' is sufficient to give rise to a duty to defend."  Doc. #20, p. 3, para. 2 (emphasis in original).  Mara contends that, because the Ninth Count was framed as a negligence action, Middlesex has a duty to defend.

The difficulty with this contention is that Connecticut courts look past the terminology in pleading to grant summary judgment for the insurer, holding there is no duty to defend a negligence action which is actually based on intentional acts by the insured.[29]  As one Connecticut court explained in *Middlesex Mutual Assur. Co. v. Rand*, 1996 WL 218698, at *2 (Conn. Sup. 1996), merely describing an action in terms of "negligence" is of no consequence when the action itself "can only be deemed intentional."   In other words, "[a] plaintiff, by describing his or her cat to be a dog, cannot simply by that descriptive designation cause the cat to bark."  1996 WL 218698, at *2

_____

[29]The Connecticut Supreme Court has explained its "broad" and "realistic" interpretation of pleadings:

> In Connecticut, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically.... [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties.... Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension.

*Deming v. Nationwide Mutual Ins. Co.*, 279 Conn. 745, 778 (2006) (internal quotations and citations omitted);  *see also Clinch v. Generali-U.S. Branch*, 110 Conn. App. 29, 37 (Conn. App. 2008) (citing *Deming* to interpret complaint in underlying action to hold insurer had no duty to defend where "negligence" count was tied inextricably to  "assault and battery").

(quotations and citations omitted). [30]

In *State Farm Fire & Cas. Com .v Bullock*, 1997 WL 309584 (Conn. Sup. 1997), a Connecticut court examined a negligence count to determine the issue of whether the insurer had a duty to defend policy holders where the complaint alleged harm from threats, assault and battery. The policy holders were parents of a middle school student who threatened and physically beat another student.  The victim's parents brought action against the policy holders seeking to recover for emotional and physical damages inflicted upon their son.  Included in the complaint were two counts in negligence for "use of excessive and unreasonable force."  As in the case at hand, the policy holders' insurer, State Farm, sought a declaratory judgment that it had no duty to defend in the action because the injuries were not the result of an "occurrence," defined as "accident" in the policy.  The policy also excluded  recovery for bodily injury or property damage which is "either expected or intended by an injured" or "the result of willful and malicious acts of an insured."  1997 WL 309584, at *2.

In the sixth count of the complaint, pled as "negligence," the plaintiffs asserted that the defendant's minor son "negligently used an excessive and unreasonable amount of force."  However, that count also incorporated by reference the allegations of the previous count for intentional assault, namely that the defendant's minor son  verbally threatened, pushed, and struck the victim on the face and body, causing him to fall to the ground and lose consciousness.  The court first pointed out that the title of the cause of action, "negligence," was not controlling for purposes of determining whether

---

[30]      What's in a name? That which we call a rose
            By any other word would smell as sweet . . .

*Romeo And Juliet*, Act II, scene 2, 43-44.

29

the insurance company had a duty to defend.  Rather, the court was duty bound to examine the facts alleged in the so-called "negligence" count.  *Id.*  The court concluded that, although the count described the actions of the policy holders' son in terms of negligence, the "factual allegations manifestly describe an intentional assault."  *Id.*

The court acknowledged that "intentional conduct and negligent conduct, although differing only by a matter of degree . . . are separate and mutually exclusive." [31]  *Id.* at *5. However, "[i]f intent to harm is present, it is immaterial that the actual injury caused is different in character or magnitude from that originally contemplated."  *Id.* (citing *State Farm Fire & Casualty Co. v. Bomke*, 849 F.2d 1218, 1219 (9th Cir. 1988)).  "The intent itself may be *actual or inferred from the nature of the act* and the accompanying reasonable foreseeability of harm.  The crucial question is whether . . . [the policy holders' son] intended, or expected, to cause any personal injury, not whether he intended to cause the precise magnitude of the injuries sustained ."  1997 WL 309584, at *5 (emphasis added; quotations and citations omitted).[32]  Because there can be no such creature as a reasonably prudent assailant, an unreasonably forceful assault remains an assault – " an act that is an intentional assault

---

[31]The *State Farm* court noted that, as Justice Holmes memorably said, "even a dog distinguishes between being stumbled over and being kicked." 1997 WL 309584, at *5 (quoting Oliver Wendell Holmes, The Common Law 3 (1881)).

[32]*See also Middlesex Mutual Ass. Co. v. Favreau*, 2003 WL 22234621, at *7 (Conn. Sup. 2003) ("Although several counts in the underlying action are titled 'negligence,' this designation is not determinative. A duty to defend is determined by the facts in the underlying complaint, not the titles assigned to various counts. . . .The core claim is that the insured molested a minor . . . . The presumption of intent is equally applicable to this [negligence] claim, and coverage of the claim is properly excluded in accordance with the insurance policy.") (citations omitted).

as a matter of law." *Id.*  Therefore, State Farm had no duty to defend such an intentional act.[33]

The *State Farm* court further expressed  policy considerations as a practical concern, noting that it would be unwise to allow plaintiffs to force insurers to defend by suing for intentional acts in counts of negligence.  "[A]bsent considerations of insurance . . . it would never occur to a lawyer to plead this plainly intentional tort as negligence." *Id*. (citation omitted).  The court thus explained:

> *The plaintiff pleads negligence in a case like this because he wants a deep pocket from which to satisfy a judgment or, even better, to obtain a settlement*. Normally when a defendant is sued on a theory that is inadequately pleaded, he gets the claim dismissed or, if the claim is invalid under controlling law, he gets a summary judgment. But in cases such as this the normal antidotes for invalid claims do not work. An insured defendant is often totally committed to the negligence pleading of the plaintiff because as long as the negligence claim is included in the complaint, the insured must be provided a defense on the intentional tort claim, a benefit he would not have if the spurious negligence claim were missing. It is also more likely the insurer will come up with the money to settle the entire case based on the cost of defending the negligence claim . . .  In a case where neither the plaintiff nor the defendant wants the covered claim disposed of, it is most unlikely to disappear.

*Id.*, at *6 (emphasis added).

In the present case, the Ninth Count of the underlying action is labeled as a claim for "Negligent Infliction of Emotional Distress."  Doc. #18-3, Ninth Count, p. 19-20.   Its allegations incorporate all of the allegations of the previous eight counts by reference (*Id.*,  ¶¶ 1 to 87) and, in boilerplate fashion, concludes that "defendant knew or should have known that its [sic] conduct as described above was likely to cause emotional distress which might result in illness or bodily harm to plaintiffs."  Id., ¶ 89.  This count thus points to the entire host of Mara's obviously intentional, racially-motivated actions[34]  to support a so-called claim in negligence.  As in the *State Farm* case,

---

[33]*Cf. Homesite Ins. Co. v. Koch*, 2007 WL 575451 (Conn. Super. 2007) (allegation of trespass did not bring complaint within "intentional acts" policy exclusion where insured lacked intent to harm or cause damage – i.e., intended merely to enter onto land but not to cause injury).

[34]For a list of these actions, see Section II.I., pp. 19-20, *supra*.

*supra*, plaintiffs in reality base their "negligence" claim on Mara's intentional acts to cause them harm.

As noted by the *State Farm* court, where Mara's alleged actions were so plainly intentional, one might reasonably surmise that the Parks family included this negligence count in their complaint against Mara for the purpose of placing Middlesex in the position of having to indemnify Mara for any recovery in the underlying action.   An insurance company is often presumed to be the "deep pocket" in litigation where an individual insured is less likely to have the means to comply with a substantial damages award.   But it is not necessary to the Court's decision to impute this strategic pleading to the Parks family.   In any event, the label "negligence" does not bring this action within the Middlesex policy's coverage.   The true basis for the action is Mara's many intentional acts of intimidation and harassment.   These acts were not by any means accidental, i.e., "occurrences" as defined in the policy.   Middlesex has no duty to defend pursuant to this count.

> b.   Invasion of Privacy (Second and Third Counts).[35]

Mara next points to the Second and Third Counts of the Parks' complaint to contend that they should give rise to a duty to defend.   As to the Second Count, he claims that if writing on his windshield did not constitute "publication" as a matter of law, no publication occurred.   Therefore, he lacked the requisite intent to invade the Parks' privacy; and a duty for Middlesex to defend would arise.   Doc. #20,  p. 5, para. 4

Such an argument is inapposite.   It is not for this Court to analyze the sufficiency of the

---

[35]The complete titles of these counts are "Invasion of Privacy Based on Publicity that Unreasonably places the other in a False Light before the Public" and "Invasion of Privacy Based on Unreasonable Publicity given to Another's Private Life."  Doc. #18-3 (Second and Third Counts).

pleadings of the underlying action – i.e., to determine whether the Parks have failed to state an adequate claim.  Any such legal deficiencies in pleading should be asserted in the state court where the underlying action is pending, by motion to dismiss or for summary judgment.  Furthermore, it is not for this Court to determine the merits of the causes of action in the underlying complaint. Whether those claims are supported by adequate evidence is not an issue before this Court.  It is this Court's sole duty to determine whether the actions as pled are based on the intentional acts of the insured and thus outside the policy coverage.

In that regard, it strains credulity to suppose that Mara did not intend to create distress and anxiety in Emmantha Parks by the acts referenced in the Second and Third Counts: writing "BLACK DICK + WHITE GIRL = GOAT GIRL (SLUT)" on his truck in large white letters.  Given the fact that Emmantha's parents are an African-American father and Caucasian mother and are the only interracial couple in the vicinity, and given the large size of the letters and the position of the writings (on the windshield and side of Mara's truck, which was parked on his driveway in close proximity to the road and raised on a flatbed for use as a "billboard"), the inference is compelled that these hateful racial epithets were targeted at Emmantha, published for the view of passers-by, and intended to cause Emmantha extreme emotional distress.  These writings were the intentional acts of racial bigotry that resulted in Mara's arrest and ultimate conviction. Doc. #18-3 (Order of Probation).[36]  The Second and Third Counts give rise to a duty on the part of Middlesex to defend Mara under the

---

[36]Mara's argument with regard to the allegations in the Second Count (invasion of privacy based on publicity) is particularly spurious.  He claims that if he truly acted in "reckless disregard" as to the possible falsity of the publicized matter, he acted without the requisite intent to harm.  Doc. #20, p. 6, para. 2.  Mara cannot be heard to say that he painted virulent racial slurs about teenaged Emmantha Parks (i.e., a girl of mixed race is a "GOAT GIRL/SLUT") for public view without knowing that these writings were false and/or without intending to cause harm.

policy.

c.      Libel (Sixth Count)

Lastly, Mara points to the Parks' libel claim in the Sixth Count and argues that it is legally deficient because the count  is labeled "libel" when it is truly "libel per quod," leading him to the conclusions that there is "nothing in the Sixth Count that alleges the existence of a subject to constitute a claim of libel," Doc. #20, p. 6,  para. 2, and Middlesex "embellishes that Count by drawing inferences from the fact  pleading comprising other Counts." *Id.*   Once again, Mara addresses the sufficiency of the pleadings and his argument fails to meet the mark.

First and as stated above, neither the sufficiency nor the merits of the Parks family's complaint against Mara are before this Court.  Second, there is nothing that bars a plaintiff from incorporating  allegations from another count to set forth a claim.  The libel count incorporates, *inter alia*, paragraph 11 of the First Count, which states that the racial epithets were clearly directed to Emmantha and her parents. The Sixth Count identifies the intended subjects (i.e., victims) of Mara's writing.

From the allegations in the complaint, one can reasonably conclude that the racial epithets written on Mara's windshield were targeted at his minor neighbor, Emmantha Parks, and her parents. These writings were just one more intentional assault in Mara's relentless campaign to insult, harass, and intimidate the Parks family, as alleged in the family's complaint.  The libel action of the Sixth count creates no duty to defend.

34

K.      No Duty to Indemnify

Plaintiff Middlesex also seeks a declaratory judgment that it has no duty to indemnify Mara

for any judgment arising from the claims in the underlying action.  Doc. #1, ¶ 27 (b).  Connecticut

law holds that the duty to defend is much broader than the duty to indemnify.  *Middlesex Mut. Assur.*

*Co. v. Rand*, 1996 WL 218698, at *3 (Conn. Sup. 1996) (citing *Martin v. Brunzelle*, 699 F. Supp. 167,

168 (N.D. Ill.1988).    It thus follows that where no duty to defend exists, there is no duty to

indemnify.  *See, e.g.*,  *Barbarula Ex. Rel. Estate of HE v. Canal Ins. Co.*, 353 F. Supp. 2d 246, 252

(D. Conn. 2004).[37]

As stated above, Middlesex has no duty to defend Mara in the underlying action.  Accordingly,

this Court finds that Middlesex also has no duty to indemnify him for any damages arising from that

action.


L.      Request for Reimbursement of Costs and Attorney's Fees

Middlesex's third declaratory request seeks "costs of suit, attorneys fees, and such other relief

as the Court may deem proper and just."  Doc. #1, p. 4, ¶ 27 (c).  Because Middlesex has prevailed

---

[37]The court in *Barbarula Ex. Rel. Estate of HE v. Canal Ins. Co.*, 353 F. Supp.2d 246,
252 (D. Conn. 2004) explained as follows:

It is well-settled [under Connecticut law] that the duty to defend is triggered whenever a
complaint alleges facts that potentially could fall within the scope of the coverage,
whereas the duty to indemnify arises only if the evidence adduced at trial establishes that
the conduct actually was covered by the policy. *Because the duty to defend is significantly
broader than the duty to indemnify, 'where there is no duty to defend,
there is no duty to indemnify.'*

(Emphasis added) (citing *DaCruz v. State Farm & Casualty,* 268 Conn. 675, 688 (2004) (*a/k/a
"DaCruz III"*)).    *Accord END Metallurgical, Inc. v. Aetna Casualty & Surety Co.*, 905 F.2d 8,
11 (2d Cir.1990) (no duty to defend necessarily means no duty to indemnify).

on the duty to defend and the duty to indemnify issues, it is entitled to file a bill of costs under Local Rule of Civil Procedure 54(a).   *See, e.g., Canal Ins. Co. v. Haniewski*, 2001 WL 1517458, at *6 (Conn. Super. 2001) (where court issued declaratory judgment in favor of insurer, insurer had "prevailed on the duty to defend issue" and was thus "entitled to file a bill of costs in the normal course.").   Any objections to the bill shall be submitted to the Clerk of the Court in accordance with Local Rule 54(b).

As to attorneys' fees expended in obtaining declaratory judgment, "it is well established that attorneys fees 'are not ordinarily recoverable  in the absence of a statute or enforceable contract providing therefor.' " *Summit Valley Indus., Inc. v. United Bhd. of Carpenters & Joiners*, 456 U.S. 717, 721 (1982)  (quoting *Fleischman Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967)); *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 74 (2d Cir. 2004). *Accord A. Secondino & Son, Inc. v. LoRicco*, 19 Conn. App. 8, 15 (1989) (under Connecticut law, "attorney's fees are not allowed to the prevailing party as an element of damage unless recovery is allowed by statute or contract" ).

Connecticut courts in insurance cases have declined to award attorney's fees when rendering declaratory judgment absent a showing of statutory or contractual entitlement.   *See, e.g., Canal Insurance Co.,* 2001 WL 1517458 at *6  (declining to award attorney's fees expended by insurer to obtain declaratory judgment where the insurer failed to show any legal entitlement, either contractual or statutory, to the fees).   In the present case, Middlesex has pointed to no provision in the insurance policy that provides for  reimbursement of attorneys' fees in the present circumstances.   Moreover,

Middlesex has presented no facts or relevant law showing legal entitlement. [38]  Absent a showing of contractual or statutory entitlement, the Court declines to award  Middlesex attorney's fees.


III.   <u>CONCLUSION</u>

Plaintiff Middlesex seeks a declaratory judgment that it has no duty to defend Mara in the underlying action and is not obligated to indemnify him against damages arising out of that action.  Middlesex has moved for summary judgment.  The Court finds that Middlesex has met its burden of showing that there is no genuine issue of material fact and Middlesex is entitled to judgment as a matter of law.   Mara's homeowner's insurance policy with Middlesex provided liability coverage for bodily injury or property damage caused by an "occurrence," defined as an "accident."  Moreover, the policy expressly excluded from coverage bodily injury or property damage "which is expected or intended by the insured."  Interpreting the natural and ordinary meaning of the policy provisions, the Court holds that a reasonable insured would comprehend that any liability resulting from intentional actions, aimed at causing injury, was not covered by the policy.

Examining the four corners of the complaint in the underlying action, the Court finds that the alleged  racially-motivated,  outrageous  and  extreme  acts  by  Mara  were  intentional,  both  in commission and result, and a very far cry from being accidental in any way.  The damages he inflicted upon the Parks family were not the result of "occurrences" within the meaning of the policy.  Accordingly, Middlesex has no duty to defend Mara in the underlying action.  Where it has no duty

---

[38]The Court concedes that there may be circumstances under which an insurer may be entitled to recover the expense of defending its insured in the underlying action. *See, e.g., Canal Insurance Co. v. First General Insurance Co.*, 889 F.2d 604, 612  (5th Cir.1989).  In the present case, however,  Middlesex has  requested "attorneys fees" without reference to the underlying action.  The Court thus will not address the issue.

to defend, Middlesex has no duty to indemnify.

Plaintiff Middlesex's motion for summary judgment is hereby GRANTED.  The Court hereby DECLARES and ADJUDGES that the plaintiff Middlesex Insurance Company has no duty to defend or indemnify defendant David Mara in *Alton Parks et al. v. David A. Mara*, Docket No. HHD-CV06-5005257-S, filed by the Parks family in the Connecticut Superior Court in the Judicial District of Hartford.

The Clerk is directed to terminate the case, with costs to the plaintiff.

It is So Ordered.

Dated:  New Haven, Connecticut
March 29, 2010

*/s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE